UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM SPELLAZZA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   vs. | ) | 3:08-cv-100-RLY-WGH |
| | ) | |
| INDIANA DEPARTMENT OF NATURAL | ) | |
| RESOURCES, | ) | |
|     Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, William Spellazza ("Plaintiff"), was hired by the defendant herein, the Indiana Department of Natural Resources ("DNR"), in 1995. Other than a temporary transfer to DNR's New Harmony, Indiana, facility in 2002, Plaintiff worked at DNR's Angel Mounds facility in Evansville, Indiana, at all relevant times. In June 2006, Plaintiff was given a performance evaluation in which he failed to meet expectations in several categories. As a result of that performance evaluation, Plaintiff was placed on a sixty-day work improvement plan. After failing to fulfill the objectives of the work improvement plan, Plaintiff's employment was terminated in September 2006.

Plaintiff subsequently filed the present lawsuit against the DNR challenging his termination as unlawful. Specifically, he alleges that he was discriminated against because of his Native American heritage and was retaliated against for engaging in protected activity in 2000, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII") and 42 U.S.C. § 1981 ("Section 1981"). The DNR now moves for summary judgment. For the reasons set forth below, the court **GRANTS** the motion.

**I.      Factual Background**

1.   In September 1995, Plaintiff began work as a full-time employee with the DNR at the Angel Mounds facility in Evansville as an assistant historic site curator. (Deposition of William Spellazza ("Plaintiff Dep. at 13, 16).

2.   In 1999, Mike Linderman ("Linderman") was assigned to the Angel Mound's facility as historic site manager, and was Plaintiff's direct supervisor. (*Id*. at 16; Deposition of Mike Linderman ("Linderman Dep.") at 11).

3.   In 2002, Bruce Beesley was hired by DNR and acted as Linderman's direct supervisor, as well as the direct supervisor of other historic site managers. (Deposition of Bruce Beesley ("Beesley Dep.") at 8, 13-14).

4.   Plaintiff did not have regular contact with Beesley during the course of his employment, and at most saw him half a dozen times per year. (Plaintiff Dep. at 101-02).

5.   In October 2000, Plaintiff submitted a letter to Larry Macklin ("Macklin"), who works in the DNR's Indianapolis central office, complaining on behalf of two female co-workers about a sex toy found by Linderman on the Angel Mound's site, and Linderman's subsequent behavior regarding that item. (*Id*. at 38-40; Linderman Dep. at 67).

6.   In November 2000, Linderman received a letter of reprimand for the incident

regarding the sex toy and was required to attend sexual harassment training. (Linderman Dep. at 79-80).

7. In the spring of 2002, Plaintiff was sent to DNR's New Harmony site to catalog artifacts and aid in the management of the property because the manager in New Harmony was without an assistant. (Plaintiff Dep. at 49-50; Linderman Dep. at 39-40). Plaintiff was told the move would be temporary.

8. The decision to transfer Plaintiff to the New Harmony site was made by Rachel Perry, then director of historic sites. (Plaintiff Dep. at 52; Linderman Dep. at 40).

9. Plaintiff returned to the Angel Mounds facility from the New Harmony site in September 2002. (Plaintiff Dep. at 51).

10. In June 2006, Plaintiff, along with another employee, was disciplined and suspended for sending out an unauthorized letter about Native American Days. (*Id*. at 58).

11. Plaintiff testified that Linderman gave him permission to send out the letter. (*Id*.).

12. In 2006, the state historic sites division of DNR added program development personnel specifically for school programming. The job of these program developers was to work with site managers and cultural administrators to expand new programs for schools and others to increase visitation to the sites. (Beesley Dep. at 32). Plaintiff had developed programs like these in the past. (Plaintiff Dep. at 72).

13. Also, in January 2006, Plaintiff was given a performance management plan setting

forth performance expectations, including developing site programs, school outreach programs, and budgeting. (Declaration of Amanda Ricketts ("Ricketts Dec.") ¶ 9, Ex. 4).

14. The performance management plans were developed as part of a new state-wide pay-for-performance compensation plan. (*Id*. ¶ 10). The cultural administrators at the other state sites were issued the same basic guidelines. (Linderman Dep. at 51-52).

15. The roll out of the plans resulted in many state employees receiving their annual evaluations slightly later than the twelve month schedule. (Ricketts Dec. ¶ 10).

16. During this time, Linderman, Beesley, and Kathleen McClary ("McClary"), Historic Sites Director at that time and the supervisor for Beesley and, in turn, Linderman, began to see problems with the performance of Plaintiff. (Beesley Dep. at 25-26). Plaintiff was asked to develop and create new programming, but Plaintiff provided no new programs. (*Id*. at 32-33).

17. As a result of his failure to provide new programming, in June 2006, Plaintiff was given a performance evaluation in which it was noted that he did not meet expectations in developing programs, outreach, or securing funding. He was also found not to have met expectations in general areas such as planning and organizing. (Ricketts Dec. ¶ 11, Ex. 5).

18. Thereafter, in an effort to improve Plaintiff's work abilities, Plaintiff was placed on a work improvement plan. (*Id*. ¶ 12, Ex. 6).

19. The duration of Plaintiff's work improvement plan was sixty days. The work improvement plan outlined four expectations: (1) he was to produce at least one new school outreach offering for a grade level of his choice; (2) he was to have at least one specialized on-site tour for the September program offering; (3) he was to be a cooperative and active member of the site and regional team; and (4) he was to attend an interpersonal relations workshop. (*Id.*).

20. The work improvement plan stated that failure to improve performance to at least meet expectations could result in termination. (*Id.*).

21. A meeting was held with Plaintiff to outline and review the expectations and time frame of the work improvement plan. (*Id.*). Plaintiff signed the plan. (*Id.*).

22. Plaintiff did not fulfill the objectives of the work improvement plan. Although he presented outline concepts, he never brought any ideas to completion. Further, he failed to attend an interpersonal workshop during the sixty-day period. (*Id.* ¶ 13).

23. In response to the work improvement plan, Plaintiff had an idea for a program centered around corn, which he relayed to his supervisor. He contended it could be used for both on-site and off-site programming. (Plaintiff Dep. at 76-77). He thought pottery could be used for the program, but he did not contact any vendors for pricing, instead looking on-line. (*Id.* at 78-79). He thought artisans could be a part of the program, but he never contacted any artisans concerning their availability. (*Id.* at 76, 80). He eventually submitted a one-page outline of his programming plan. (Defendant's Ex. F).

24. Plaintiff was given a choice by DNR of three seminars to attend, but he could not make a decision as to which to attend. (Plaintiff Dep. at 8). More than a month after the issuance of his work improvement plan, he emailed DNR human resource employee Jeff Saucerman ("Saucerman") to pick one for him. (*Id*., Ex. 10). By that time, all three seminar dates had passed, and Plaintiff was directed to pick another one. (*Id*. at 86). He identified one, a few days later, which was scheduled for September 13, 2006 – after the close of his work improvement plan. Saucerman informed Plaintiff that because the seminar was scheduled after the close of sixty days, it could negatively affect his evaluation. (*Id*., Ex. 10).

25. During this time period, Plaintiff was to be in contact with the program development personnel from DNR, but to Linderman's knowledge, he was not conferring with them, although Linderman directed him to do so. (Linderman Dep. at 57).

26. A pre-deprivation meeting was held on September 6, 2006, to address the outcome of the work improvement plan. Amanda Ricketts ("Ricketts"), then Human Resources Director at DNR, as well as other DNR officials, were present for the meeting. (Ricketts Dec. ¶ 14).

27. Plaintiff was given an opportunity to provide a reason for not meeting expectations, but his explanation was vague. (*Id*.).

28. Plaintiff testified that he felt intimidated during the meeting. (Plaintiff Dep. at 141-42).

29. Plaintiff was, thereafter, terminated for failure to complete the work improvement plan and lack of performance. He failed to attend an interpersonal relations workshop during the work improvement time period, he failed to present a completed outreach offering or on-site program, and he failed to present his ideas in a constructive manner or work as a team with site and regional staff. (Ricketts Dec., Ex. 7).

30. Although the Director, McClary, had the ultimate authority to terminate Plaintiff and did, the recommendation to terminate Plaintiff was a collaboration among Linderman, Beesley, and McClary. (Linderman Dep. at 13-14; Beesley Dep. at 14-15, 49).

31. During a meeting at Angel Mounds prior to Plaintiff's work improvement plan, an independent Native American contractor, William Biggs ("Biggs"), claims that Beesley stated in his presence, "these Native Americans, these Indians are overpaid. . . . You can't count on them, they're on their own time schedule; they're worthless." (Biggs Dep. at 16). Plaintiff was not in the room when the comments were made. (*Id.*). Beesley denies making any such statements but admits he may have said something about a particular, specific group of historic reenactors being overpaid. (Beesley Dep. at 46-48).

32. Following his termination, Plaintiff filed a charge with the Equal Employment Opportunity Commission on April 24, 2007. (Plaintiff Dep. at 120-21; Plaintiff Dep. Ex. 12; Ricketts Dec. ¶ 16).

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

## III. Discussion

### A. Plaintiff's Section 1981 Claim and Defendant's Statute of Limitations Argument

Plaintiff brought his national origin/race discrimination and retaliation claims under Title VII and Section 1981 against the DNR, an agency of the State of Indiana. Ind. Code § 14-9-1-1. As an agency of the State of Indiana, it enjoys Eleventh

Amendment sovereign immunity from private party lawsuits brought in federal court. *Baker v. Indiana Family & Social Servs. Admin.*, 260 F.Supp.2d 731, 737 (S.D. Ind. 2003) (finding that Congress has not abrogated sovereign immunity with respect to Section 1981 claims). The DNR has not consented to being sued on this claim in federal court, and has not waived its sovereign immunity. *Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1994) (noting that "a state may by unequivocal language waive the protections of the eleventh amendment"). Accordingly, the DNR's motion must be **GRANTED** with respect to Plaintiff's Section 1981 claims.

In addition, Plaintiff does not contest the assertion that any claim premised on an adverse action – such as his temporary transfer in 2002 – taken outside of the statutory period is barred. Accordingly, summary judgment must be **GRANTED** with respect to any claim raised by Plaintiff regarding his 2002 temporary transfer to New Harmony, Indiana. *United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000) ("Arguments that are not adequately developed or supported are waived . . . .").

### B.     Plaintiff's Title VII National Origin/Race Discrimination Claim

In order for Plaintiff to prevail on his claim of national origin/race discrimination under Title VII, Plaintiff must present either direct or indirect evidence that the decision to terminate him was based upon his national origin/race. *See Alexander v. Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). In support of his claim, Plaintiff asserts that he has direct evidence of discrimination based upon the comment made by Beesley, in which Beesley allegedly stated, "These Native Americans,

9

these Indians are overpaid. . . You can't count on them; they're on their own time schedule; they're worthless."  (Biggs Dep. at 15-16).

"'To rise to the level of direct evidence of discrimination . . . isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process.'" *Adams v. Triton College*, 35 F.App'x. 256, 259 (7th Cir. 2002) (quoting *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002)); *see also Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) (finding that an inference of discrimination may arise if the decision maker expressed discriminatory feelings "(1) around the time of, and (2) in reference to, the adverse employment action complained of.").  Here, Beesley's alleged comment was made approximately three to four months before the adverse action at issue – i.e., Plaintiff's termination – and thus, was not made contemporaneously to it.  Moreover, the alleged comment did not concern Plaintiff's termination or Plaintiff's employment in general.  Beesley allegedly made the comment during a programming meeting while looking over a proposal from Jeremy Biggs, an independent contractor.  (Biggs Dep. at 15-16).

In addition, Beesley was not the sole decision maker with regard to Plaintiff's termination.  The evidence reflects that Beesley made the decision jointly with McClary and Linderman.  (Beesley Dep. at 15).  To this end, there is no evidence that, in making their determination to terminate Plaintiff,  McClary and Linderman relied upon inaccurate information provided by Beesley.  *See Dorsey v. Morgan Stanley*, 507 F.3d 624, 628 (7th Cir. 2007) (finding that a non-decision maker with a retaliatory motive may exert

influence over the decision maker to such a degree as to make the employer liable for his actions, such as by withholding relevant information or providing false information to the decision maker). Accordingly, Plaintiff's claim for national origin/race discrimination fails as a matter of law.

### C. Plaintiff's Title VII Retaliation Claim

In order for Plaintiff to establish his retaliation claim under the direct method of proof, Plaintiff must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Treadwell v. Office of Ill. Sec. of State*, 455 F.3d 778, 781 (7th Cir. 2006). Plaintiff's evidence of protected activity occurred in 2000, when he submitted a letter to Macklin from the DNR's central office to complain on behalf of two female co-workers about Linderman's inappropriate comments and behavior regarding a sex toy he found on Angel Mound's property. Plaintiff was terminated in September 2006, some six years later.

As a general proposition, as the temporal proximity between the protected expression and the adverse action increases, the less likely that there exists a causal link between the two events. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996). In cases that permit a retaliation claim to go forward when a long lapse of time occurs (typically a year) between the protected expression and the adverse action, there must exist "additional circumstances which raise[] suspicion about the legitimacy of the employer's acts." *Id*.

Plaintiff essentially argues that Linderman "lied in wait" for six years to exact revenge for Plaintiff's act of reporting him in 2000. More specifically, he argues:

> A rational finder-of-fact could reasonably find that Linderman laid in wait to exact his revenge on [Plaintiff] for reporting him for sexual harassment until circumstances provided an apparent pretext for the termination of Plaintiff's employment. A rational finder-of-fact could reasonably conclude that the opportunity did not present itself until Biggs informed Linderman of Beesley's racial animus for Native Americans; realizing that his supervisor would concur in the termination decision for his own unlawful[,] race-based reasons. Indeed, this is what occurred.

(Plaintiff's Response at 15).

Other than Plaintiff's speculation that Linderman was lying in wait for the opportunity to punish him for having complained about the sex toy incident, Plaintiff fails to provide evidence of additional circumstances which would raise suspicion as to the true reasons for DNR's decision to terminate him. Without such evidence, Plaintiff fails to show a causal connection between his complaint in 2000 and his termination in 2006. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (finding no causal connection where employee was terminated one year after she filed a complaint); *see also Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1115 (7th Cir. 1992) (noting that three-year time lapse "discounts" a causal connection between two events); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511-12 (7th Cir. 1998) (finding no causal connection where employee was terminated five months after filing EEOC complaint without additional proof of a causal nexus). Plaintiff's retaliation claim therefore fails as a matter of law.

**D.     Pretext**

To establish pretext, Plaintiff must show "such implausibilities, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons."  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).  So long as the DNR honestly believed the reasons it gave for the adverse action, Plaintiff may not prevail, "even if the reasons are foolish, trivial, or baseless."  *Id.*

There is no direct or circumstantial evidence to establish that the decision makers' true reason for terminating Plaintiff's employment concerned Plaintiff's complaints about the sex toy.  Rather, the evidence reflects that Plaintiff was not performing his job to the DNR's satisfaction:

- Plaintiff was given a performance management plan at the beginning of January 2006, where he was rated as not meeting expectations in the areas of developing programs, outreach, and securing funding, and planning and organizing.

- The work improvement plan noted that failure to meet expectations and the level prescribed in the plan could result in termination.

- Plaintiff did not fulfill the objectives of his work improvement plan within the sixty-day time period allotted to him.

- He presented outline concepts but never brought an idea to completion.

- He also failed to attend an interpersonal workshop during the work improvement plan, as required.

- At his pre-deprivation meeting, he failed to present an explanation for not meeting the requirements of the work improvement plan.

- Plaintiff was therefore terminated from his employment.

The court finds, given this evidence, that Plaintiff was terminated for legitimate reasons. Accordingly, and for the reasons more fully explained in the DNR's supporting and opposing briefs, the court must **GRANT** the DNR's Motion for Summary Judgment.

### III. Conclusion

For the reasons set forth above, the Defendant's Motion for Summary Judgment (Docket # 32) is **GRANTED**.

**SO ORDERED** this __4th__ day of January 2010.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Andrew Dutkanych III
BIESECKER & DUTKANYCH LLC
ad@bdlegal.com

Roy W. Harris Jr.
BIESECKER & DUTKANYCH LLC
rharris@bdlegal.com

Cory Christian Voight
INDIANA OFFICE OF THE ATTORNEY GENERAL
cory.voight@atg.in.gov